

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-23-2000

# East Min. & Chem Co v. Mahan

Precedential or Non-Precedential:

Docket 99-3320

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"East Min. & Chem Co v. Mahan" (2000). *2000 Decisions.* Paper 173.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 23, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3320

EASTERN MINERALS & CHEMICALS CO.;
CARY W. AHL, SR.,
        Appellants

v.

GARY H. MAHAN

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 97-cv-01941)
District Judge: Hon. William W. Caldwell

Argued February 3, 2000
Before: MANSMANN, NYGAARD and RENDELL,
Circuit Judges

(Filed August 23, 2000)

        Dale E. Lapp, Esq. [ARGUED]
        244 Butler Avenue
        Lancaster, PA 17601
         Counsel for Appellants

        James J. Kutz, Esq. [ARGUED]
        Kathleen Misturak-Gingrich, Esq.
        Eckert, Seamans, Cherin & Mellott
        213 Market Street, 8th Floor
        Harrisburg, PA 17101
         Counsel for Appellees

OPINION OF THE COURT

RENDELL, Circuit Judge.

Eastern Minerals & Chemicals Co., a creditor of Delta Carbonate Inc., appeals an order of the District Court precluding it from seeking recovery from Delta's sole shareholder, Gary Mahan, on an alter ego theory because Eastern should have pursued this claim in the context of Delta's bankruptcy case. We conclude that the District Court misapplied claim preclusion in this bankruptcy setting. Therefore, we will reverse the District Court's order granting Mahan's motion for summary judgment.

Eastern also appeals the District Court's denial of its motion to amend its complaint to add a RICO count against Mahan and to join other defendants believed to be jointly and severally liable. The District Court did not abuse its discretion in denying Eastern's motion, and therefore we will affirm as to that order.

We have jurisdiction to hear this appeal under 28 U.S.C. S 1291. We exercise plenary review over a district court's order granting summary judgment. See New Jersey Turnpike Authority v. PPG Indus., Inc., 197 F.3d 96, 104 (3d Cir. 1999).

Facts and Procedural History

Eastern was party to a sales agency contract with Bestone, Inc., a business in York, Pennsylvania that mined a quarry and produced calcium carbonate. In 1989, Delta acquired Bestone's assets and assumed Bestone's contracts, including the Eastern contract. Delta, which is solely owned by Mahan, was one of a group of companies owned or partially owed by Mahan, including Millington Quarry, Inc. and PenRoc, Inc. In January 1994, Delta and PenRoc both filed petitions for relief under chapter 11 of the Bankruptcy Code,1 and Delta liquidated its assets in the context of its chapter 11 case.

_____

1. The cases were administratively, but not substantively, consolidated.

2

Eastern actively participated in Delta's bankruptcy case by challenging various actions and decisions of Delta, consulting with other creditors, and exploring alternatives for maximizing its return. Eastern opposed Delta's proposed rejection of its sales agency contract with Eastern pursuant to 11 U.S.C. S 365 and sought reconsideration of the Bankruptcy Court's approval of the rejection, which also included a request for acknowledgment of an equitable lien on certain contracts. App. 437a–439a. Based on the rejection of its contract, Eastern filed a proof of claim for over $2.2 million in Delta's bankruptcy case, to which Delta objected. As discussed below, Eastern ultimately agreed by consent order to reduce its claim to $900,000. App. 674a.

Eastern was quite aggressive in challenging Delta and its dealings with affiliated entities at every turn of the bankruptcy case and repeatedly asserted that Delta had been used for the benefit of the affiliated companies, primarily Millington, to the detriment of Delta's creditors. Eastern circulated a draft application to disqualify Delta's counsel, asserting that he could not properly represent Delta in light of his representation of PenRoc, had not disclosed facts relevant to his representation as debtor's counsel, actively concealed facts, and arranged for employment of special counsel that was not disinterested by virtue of its prepetition claim against Delta. App. 405a. It also attempted to disqualify Delta's special counsel, asserting that counsel was a prepetition creditor of Delta and thus was not disinterested, and that counsel had an actual conflict of interest based on its representation of Millington. App. 452a–454a. Not only did Eastern object to Delta's request for appointment of appraisers and consultants in connection with the valuation and sale of Delta's assets, alleging that they were not disinterested because they previously had performed services for Millington, App. 27a, but it also objected to a proposed sale of Delta's assets, alleging that the sale was not proposed in good faith and that such a sale should go forward only in the context of a confirmed plan of reorganization. App. 254a–255a.

Eastern attached to its objection to the sale of Delta's assets a draft complaint seeking equitable subordination of

3

certain claims of Millington and its primary lender Chemical Bank to the claims of Eastern and other unsecured creditors under section 510 of the Bankruptcy Code. App. 272a.2 The committee of unsecured creditors ("Committee") also sought leave of court tofile a complaint on behalf of the estate requesting, inter alia , equitable subordination of the claims of Millington and Chemical Bank.3 Both complaints allege that Millington and Chemical Bank obtained liens on Delta's assets without any lawful basis and improperly received $4.3 million in postpetition payments from Delta. App. 380a.4 Eastern did not seek to subordinate any claim held by Mahan himself,5 although the complaint included a description of how Mahan allegedly engaged in conduct causing Delta to prefer Millington over Delta's other creditors. App. 289a. These complaints were never filed, and there was never afinal judgment on the merits of the putative equitable subordination dispute.

_____

2. A court may subordinate an allowed claim for purposes of distribution under principles of equitable subordination. 11 U.S.C. S 510(c). Most courts have required a showing that the claimant engaged in inequitable conduct resulting in injury to creditors or unfair advantage to the claimant, and that equitable subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. See Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims, 160 F.3d 982, 986–987 (3d Cir. 1998) (citing United States v. Noland, 517 U.S. 535 (1996)).

3. The Committee's request was based on the improbability that Delta, as debtor–in–possession, would file such a complaint itself; an affidavit of the chairperson of the creditors' committee asserted that "in light of the fact that one of the proposed defendants, Gary Mahan, is the 100% shareholder of the Debtor and at least a 51% shareholder of another proposed defendant, Millington, it is unrealistic to expect the Debtor to be able to bring the actions set forth in the complaint." App. 369a. The Committee's draft complaint named Mahan as an additional defendant, but not with respect to the equitable subordination count.

4. The Committee's draft complaint further alleges that Millington and Chemical Bank "demonstrated a callous disregard for the rights of the Debtor and its unsecured creditors and have proceeded to improve their position without regard to the such parties, the facts, or the law." App. 380a.

5. Mahan had a claim against Delta, which ultimately was extinguished pursuant to Delta's chapter 11 plan. App. 232a.

Eastern ultimately agreed to reduce its $2.2 million claim to $900,000 and withdrew its opposition to the sale of Delta's assets, and consented to the amendment of Delta's liquidating chapter 11 plan to provide a fund to pay unsecured creditors a portion of their claims. Eastern's pro rata distribution was slightly more than $380,000, approximately 42% of its $900,000 claim.

In October 1997, after Delta's bankruptcy case was closed, Eastern filed a complaint in the York County Court of Common Pleas naming Mahan as defendant. Eastern sought to recover $580,783.13, the remaining 58% of the $900,000 claim that Eastern did not receive from Delta by piercing the corporate veil on an alter ego theory. App. 649a.[6] Eastern alleged that Mahan caused Delta to be undercapitalized, "pilfered" corporate opportunity, and acted to further his own personal ends, thereby abusing corporate privilege and breaching his fiduciary duty and his duty of loyalty.[7] App. 650a, 668a. The complaint provides

_____

6. The " `classical' piercing of the corporate veil is an equitable remedy whereby a court disregards `the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.' " In re Blatstein, 192 F.3d 88, 100 (3d Cir. 1999) (quoting In re Schuster, 132 B.R. 604, 607 (Bankr. D. Minn. 1991) (citations omitted)). We have commented that "Pennsylvania, like New Jersey, does not allow recovery unless the party seeking to pierce the corporate veil on an alter ego theory establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham. . . . In other words, both Pennsylvania and New Jersey require a threshold showing that the controlled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." Culbreth v. Amosa (Pty) Ltd., 898 F.2d 13, 14-15 (3d Cir. 1990) (per curiam). See generally Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) (listing factors for disregarding the corporate form as "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud"); Ashley v. Ashley, 393 A.2d 637, 641 (Pa. 1978) ("[w]e have said that whenever one in control of a corporation uses that control, or uses the corporate assets, to further his or her own personal interests, the fiction of the separate corporate entity may properly be disregarded").

7. The alter ego theory comes into play in piercing the corporate veil when one seeks to hold liable an individual owner who controls the

5

the following summary of the factual basis for Eastern's action:

> By way of conclusory overview . . . Eastern contends that Mahan invested heavily in Delta in the late '80s, realized his investment was in trouble by the end of 1991, and spent the next several years designing and implementing a course of conduct calculated to shift the risk of loss from himself and other affiliated alter egos of Delta, to Eastern and other trade creditors. Mahan's manipulation began with garden variety pilfering of corporate opportunity and breach of fiduciary obligation, continued with highly inappropriate conversion of his equity investment to secured indebtedness at a time when the company was both undercapitalized and insolvent, and culminated in his use and abuse of the federal bankruptcy system to assure for himself and other alter egos, the benefit of the unconscionable advantage he had taken. Along the way he routinely ignored verbal commitments and acted in knowing and intentional violation of written agreements. Self dealing, misrepresentation, and deceit were the order of the day. Mahan continuously and unabashedly used Delta and other affiliated entities as the means for the achievement of personal ends. Especially as pertains to Eastern, an involuntary creditor of Delta, giving regard and effect to the

---

corporation. See S.T. Hudson Engineers v. Camden Hotel Dev. Assoc., 747 A.2d 931, 936 (Pa. Super. 2000); Miners, Inc. v. Alpine Equip. Corp., 722 A.2d 691, 695 (Pa. Super. 1998) (citing Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1521 (3d Cir. 1994), aff 'd, 514 U.S. 938 (1995)). Factors considered under Pennsylvania law, for example, with respect to the alter ego theory include, but are not limited to, the following: "[T]he failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization." Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1059 (W.D. Pa. 1990) (citing Galgay v. Gangloff, 677 F. Supp. 295, 300 (M.D. Pa. 1987)). See also United States v. Pisani, 646 F.2d 83, 88 (3d Cir. 1981).

6

corporate form of organization would result in perpetration of fraud, illegality, or injustice, would defeat public policy, and would render the entire theory of corporate existence useless.

App. 650a-651a. Specifically, Eastern's complaint contends that Delta was severely undercapitalized and that Mahan engaged in a pattern of improper conduct:

Among other things, prior to the filing of the Bankruptcy Case, Mahan (i) set up a competing company, violating the corporate opportunity doctrine, (ii) caused Delta to prefer Millington over other creditors, in violation of fiduciary responsibility, when he granted a blanket security interest in unencumbered assets in 1992, (iii) caused Delta to pay Millington, Rockcrest and other Affiliated Entities management, development, and administrative fees that were not bona fide fees; (iv) caused Delta to violate along with Penroc [sic.], the restrictive covenant assumed by Delta in connection with the Bestone transaction, and (v) caused Delta to mislead creditors with conflicting UCC filings and descriptions subject to Millington's security interest. During the pendency of the Bankruptcy Case, through his company's attorney, Mahan (i) treated the Affiliated Entities as though they were alter egos of each other and himself, (ii) misled gullible Committee counsel and the Bankruptcy Court to believe that Millington held a secured position justifying a post-petition payment (before plan confirmation) in the amount of $4.7 million, when in fact it did not, and (iii) made every decision entrusted to Delta as debtor-in-possession with a view toward promoting his own self interest, not the interest of the estate generally.

App. 669a-670a. In December 1997, the action was removed to the United States District Court for the Middle District of Pennsylvania.

Mahan filed a motion to dismiss Eastern's complaint on several grounds, including the affirmative defense of claim preclusion. App. 12a. The District Court found that the first element of claim preclusion -- that the first suit was a final

7

judgment on the merits -- was satisfied by the entry of the plan confirmation order in Delta's bankruptcy case. The second element of claim preclusion -- that thefirst suit was between the same parties or their privies -- similarly was held to be satisfied. The District Court concluded that it could not determine from the complaint whether the third element was satisfied, namely, whether Eastern's action against Mahan was based on the same cause of action as Delta's confirmation order, and therefore denied the motion to dismiss, but considered the issue on summary judgment shortly thereafter.

In the context of the summary judgment motion, Mahan argued that the record -- including Eastern's draft complaint seeking equitable subordination in Delta's bankruptcy case, which the District Court noted"parallels the material averments of the complaint in the instant case" -- demonstrated that Eastern knew all of the facts supporting its instant cause of action against Mahan while Delta's bankruptcy case was unfolding. Slip Op. at 4. Mahan also argued that there was ample precedent for the Bankruptcy Court to exercise jurisdiction over alter ego claims. Eastern contended that the chapter 11 plan had not specifically provided for the extinguishment of Eastern's claim against Mahan, that there would have been no subject matter jurisdiction, and that barring his claim would burden bankruptcy courts with every claim creditors may have against third parties.

Although the District Court correctly set forth the third element of claim preclusion at the outset, e.g. , that the later claim is based on the same cause of action as the prior claim, the Court ultimately re-stated the test incorrectly when it concluded that "it appears that claim preclusion should bar the instant action because it is based on a cause of action that could have been raised in the bankruptcy proceedings, but for whatever reason, was not." Slip Op. at 5. In other words, the District Court's claim preclusion ruling is not predicated on a finding that Eastern's instant claim against Mahan is based on the same cause of action as a claim raised by Eastern in Delta's bankruptcy. Interestingly, the District Court later expressed second thoughts regarding this ruling, but that

8

is not before us.8 The District Court also rejected Eastern's concerns regarding the lack of subject matter jurisdiction over Eastern's claim.

Urging us to affirm the District Court's ruling that Eastern's complaint against Mahan is barred, Mahan emphasizes that Eastern knew all the facts necessary to assert its present claim during Delta's bankruptcy, and that Eastern's present claim against Mahan arises out of the same cause of action that Eastern raised in Delta's bankruptcy case.9 Eastern argues that the District Court erred by applying the claim preclusion test to bar the second action even if the prior proceeding did not involve the same cause of action, that it is not pursuing the same cause of action that was at issue in Delta's bankruptcy case, and that the District Court's ruling, if affirmed, would

_____

8. In a separate RICO lawsuit brought by Eastern against Mahan, the District Court denied summary judgment on the basis of claim preclusion on October 21, 1999. The Judge stated he believed he had erred in granting Mahan's motion for summary judgment on Eastern's complaint at issue here:

> [W]e have concluded that we erred in the No. 97-1941 memorandum. . . . Our ruling in No. 97-1941 was based on an unstated, but erroneous, premise -- that an alter ego of the debtor was the debtor for all intents and purposes. . . .[N]either Mahan nor
> Millington, even as an alter ego of Delta, can be considered the debtor and entitled to force their creditors to pursue their claims against them in the Delta bankruptcy. To the contrary, section 524(e) would prohibit them from invoking Delta's discharge in bankruptcy. . . . . No. 97-1941 was an alter ego action against Mahan alone for Delta's breach of the sales agency agreement. That case was erroneously dismissed on the basis of claim preclusion.

Slip Op. 99-0366 at 23-28 (emphasis added) (appended to Reply Brief for Appellants).

9. Mahan also asks that we reject Eastern's arguments relating to the Bankruptcy Court's putative jurisdiction over Eastern's instant claim against Mahan and to whether applying claim preclusion to bar Eastern's claim would amount to an impermissible discharge of a nondebtor in violation of 11 U.S.C. S 524(e). Based on our conclusion that Eastern's current complaint against Mahan does not arise out of the same cause of action as its claims raised in Delta's bankruptcy and thus is not barred, we need not reach these issues.

9

mean that the entry of a confirmation order in a chapter 11 bankruptcy case bars every claim that might have been asserted in the bankruptcy.10

Under the doctrine of claim preclusion, a final judgment on the merits of an action involving the same parties (or their privies) bars a subsequent suit based on the same cause of action. See Gillman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 208 (3d Cir. 2000); Arab African Int'l Bank v. Epstein, 10 F.3d 168, 171 (3d Cir. 1993). Eastern's focus, and accordingly ours as well, is the third element.11

_____

10. In light of the fact that some of Eastern's allegations stem from events occurring during the course of Delta's bankruptcy, Eastern also asserts that its claim against Mahan cannot be barred because it had not yet accrued at the time of the first action. Although we do not read the assertions in Eastern's complaint to arise only out of post-confirmation conduct or events, we need not reach this issue.

11. Eastern does not challenge the District Court's findings with respect to the first two elements, namely, that the Delta confirmation order, inclusive of the settlement, was a final judgment and that it involved both Eastern and Mahan. Although Eastern's failure to challenge the applicability of the first two elements of claim preclusion does not affect
the outcome of this appeal due to our conclusion that the third element of claim preclusion is not satisfied, we question whether the District Court too readily assumed and concluded that thefirst "dispute" in Delta's bankruptcy case involved the same parties or their privies as Eastern's current suit against Mahan. The District Court reasoned that "Plaintiff 's claims against Defendant are premised on Plaintiff 's theory that Delta was Defendant's alter ego. If Plaintiff can establish that this was so, then Defendant was a party to Delta's bankruptcy proceedings for preclusion purposes." App. 94a (citation omitted). Although we have held, in a unique factual context, that a creditor's objection to a chapter
11 plan could be considered a claim against another creditor for claim preclusion purposes, see CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 199–200 (3d Cir. 1999), the circumstances that gave rise to our narrow holding in that case are not present here. Nor do we believe it appropriate to assume solely on the basis of Eastern's current veil piercing lawsuit that Mahan was Delta's privy, as the District Court did in its decision denying Mahan's motion to dismiss. As to the first element, we recognize that an order confirming a chapter 11 plan is a final order "on the merits," but we do not decide whether those merits can be equated to the merits of the instant dispute. Cf. Huls, 176 F.3d

10

Before embarking on our analysis, it is important to identify what is not at issue. No one disputes that Eastern was an active participant in Delta's bankruptcy case, and filed a number of motions and objections claiming inequitable conduct on the part of various entities controlled by Mahan. Equally clear is that Eastern did not raise the precise claim that is the subject of this complaint, namely, that Mahan's conduct warrants piercing Delta's corporate veil and holding Mahan liable on an alter ego theory. The parties also acknowledge that claim preclusion does not bar all unasserted claims that theoretically could have been raised, but only those based on the same cause of action that was actually asserted previously. See Brief for Appellee at 33 ("Mahan has never argued that all possible causes of action must be raised in a bankruptcy such as Delta's. What he argued, and proved, is that claims which are known and asserted in a bankruptcy proceeding cannot later be asserted elsewhere."); Brief for Appellant at 18 ("in the absence of actual assertion of a cause of action in the bankruptcy proceeding, claim preclusion does not follow"). See generally Huls, 176 F.3d at 191 ("Claim preclusion bars a party from litigating a claim that it could have raised or did raise in a prior proceeding in which it raised another claim based on the same cause of action.") (emphasis added).

The issue facing us, therefore, is whether the claim currently being asserted by Eastern against Mahan is based on the same cause of action as the claims actually asserted by Eastern in Delta's bankruptcy such that its instant claim should have been asserted in that forum. Mahan says it is; Eastern says it is not.

Our case law often suggests that we consider whether there is an "essential similarity of the underlying events" to

_____

at 206 (holding that merits of dispute regarding competing interest in $600,000 were specifically resolved in confirmation order); First Union Comm. Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.), 81 F.3d 1310, 1316 (4th Cir. 1996) (barring lender from raising postconfirmation objection to secured claim of law firm when its claim was specifically addressed and resolved in context of plan confirmation).

determine whether the prior and current claim arise from the same cause of action and cite to United States v. Athlone Industries, Inc., 746 F.2d 977, 984 (3d Cir. 1984). Although we stated this test in Athlone, we did not actually apply it, ultimately holding instead that the district court erred in dismissing the action because "the suits involved different statutes, different acts, different wrongs, and necessitated different evidence to support the different material facts alleged." Id. at 986. See also Lewison Bros. v. Washington Savings Bank (In re Lewison Bros.), 162 B.R. 974, 981 (Bankr. D.N.J. 1993) (explaining that Athlone instructed that courts determine whether suits involve the same causes of action by comparing the acts and demand for relief, theory of recovery, necessary evidence, and alleged material facts). Furthermore, the "essential similarity" test, when literally construed, is ideally suited for litigation that has been generated by discrete events, such as a car accident or commercial transaction gone awry; indeed, claim preclusion is typically invoked when issues surrounding a discrete incident or transaction have been litigated previously in a civil action. However, the claim at risk of being precluded in this case is based on conduct that allegedly took place over the course of several years. Although some of the underlying events and relationships are described in terms that are similar (and indeed sometimes nearly identical) in both Eastern's complaint against Mahan and various documents Eastern circulated in Delta's bankruptcy case (e.g., the draft equitable subordination complaint), the similarity of certain events in and of itself does not trigger a bar of Eastern's subsequent complaint against Mahan. Surely the mere existence of overlapping facts and events in this setting is not sufficient to foreclose Eastern's current claim. To properly apply the affirmative defense of claim preclusion, we must take a closer look.

Claim preclusion is complicated in this case not only because the instant claim involves a multifaceted factual scenario and extensive course of events, but also because the prior litigation involved an expansive and complex chapter 11 bankruptcy case. A bankruptcy case is not a discrete lawsuit. It is commenced by the filing of a petition for relief, which then provides a forum in which any

number of adversary proceedings, contested matters, and claims will be litigated. Claim preclusion only bars claims arising from the same cause of action previously raised, not every conceivable claim that could have been brought in the context of a bankruptcy case over which the court would have had jurisdiction.12

Claim preclusion doctrine must be properly tailored to the unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case.13 Difficult as it may be to define the contours of a cause of action in a bankruptcy setting, we conclude that a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum.14 Here, that is not the case.

Eastern's participation in Delta's bankruptcy case, as previously described, was undoubtedly active and aggressive. Yet, Eastern never litigated any cause of action

_____

12. Claim preclusion would have a broad scope indeed if it barred every claim over which a bankruptcy court might have had jurisdiction. See Huls, 176 F.3d at 209 (Stapleton, J., dissenting) (noting that a broad view of claim preclusion in the bankruptcy context would likely produce "multitudinous protective filings of claims against nondebtors and the needless complication of bankruptcy confirmation proceedings").

13. Indeed, the factual setting here -- involving a closely-held debtor corporation that is part of a group of such companies controlled by one shareholder -- raises special problems, yet is all too common. Surely it cannot be the case that the corporation's bankruptcy becomes the exclusive forum to address any claims a creditor might have against the nondebtor controlling shareholder based on that shareholder's own conduct.

14. This is, after all, essentially the test that we actually applied in Athlone, and it is consistent with the reasoning in Huls, in which we recognized that courts normally must scrutinize the"totality of the circumstances" to determine whether two claims are based on the same cause of action, although we found that the claims'"essential similarity" was facially apparent in that particular instance. See Huls, 176 F.3d at 206. This test, of course, assumes subject matter jurisdiction over the later claim.

13

against Mahan that sought what its current claim would accomplish. The claim most closely resembling the current action was Eastern's draft equitable subordination complaint, which was never actually filed and which sought to subordinate the claims of Millington and Chemical Bank, not Mahan. Characterizing Millington's claim as equity or capital rather than "debt," Eastern's draft complaint essentially took the position that Millington should not have creditor status in Delta's bankruptcy, but instead should stand in line behind Delta's other creditors. Unlike that draft equitable subordination complaint, Eastern's instant complaint seeks recovery from Mahan and focuses not on whether Millington should have equivalent creditor status or whether Delta's assets were properly used to collateralize obligations of Millington to Chemical Bank, but rather on whether Mahan should be personally liable for the debt due to Eastern based on his conduct in using Delta as his "mere instrumentality" and "alter ego" for his individual benefit.[15] Although some of the descriptions of certain events and particular relationships are common to both claims, the theory of the case and relief sought in Eastern's instant complaint are markedly different from those underlying the draft complaint to subordinate the claims of Millington and Chemical Bank that Eastern considered filing in bankruptcy court.

Both Eastern and Mahan take the position that our decision in Huls dictates that they prevail on their respective positions as to whether Eastern's suit against Mahan is barred. Huls involved a lawsuit between two lenders, CoreStates and Huls, based on a subordination agreement between them. After the conclusion of the bankruptcy case of their mutual borrower, United Chemical Technologies ("UCT"), CoreStates sued Huls to recover

_____

15. We recognize that other courts of appeals have considered whether the claim holder has used the debtor as an alter ego when deciding whether a claimant has engaged in inequitable conduct such that its claim should be equitably subordinated. See, e.g., In re Lifschultz Fast Freight, 132 F.3d 339, 345 (7th Cir. 1997). However, even if we employed that analysis in this circuit, it would not affect the outcome here, particularly because Eastern sought to subordinate the claim of Millington, not Mahan.

14

$600,000 that Huls had received in the case. Hulsfiled a motion for judgment on the pleadings based on the claim preclusive effect of UCT's bankruptcy confirmation order. In UCT's bankruptcy case, CoreStates had specifically challenged the $600,000 payment to Huls by way of formal objection as well as informal colloquy with the parties and the court. CoreStates also had appealed the court's entry of the confirmation order, which, although overturned on different grounds, was ultimately followed by the successful confirmation of a second amended plan.

We affirmed the District Court's decision that claim preclusion barred CoreStates' later suit. The underlying question in Huls was whether "CoreStates has a right to receive the funds, when both CoreStates's and Huls's rights in the bankruptcy estate, and CoreStates's objection based on the payment in particular, were settled in the confirmation proceeding." Huls, 176 F.3d at 190–191. We concluded that "CoreStates functionally raised the Subordination Agreement in its objection to the Reorganization Plan," id. at 203, and that CoreStates's objection in UCT's confirmation proceedings was, in fact, a claim against Huls:

> The objection put Huls's rights in the bankruptcy estate into question. The $600,000 payment was all Huls was entitled to receive under the Reorganization Plan. A challenge to that payment amounted to a challenge to Huls's position in the scheme of distribution the Plan envisioned. In addition, Huls clearly felt that it had an interest in the issue worth preserving, since it opposed the objection extensively throughout the bankruptcy proceedings. Furthermore, Huls filed a brief in opposition to CoreStates's appeal in the District Court, and CoreStates filed a reply brief dealing almost solely with Huls's arguments. Accordingly, the Bankruptcy Judge's dismissal of CoreStates's objection and the subsequent confirmation of the Plan constitute a final judgment on CoreStates's claim against Huls.

Id. at 206. Noting that our holding was largely fact-bound and was the result of "the coincidence of several unusual circumstances," we emphasized the significance of the fact

15

that CoreStates specifically challenged the fairness of providing the $600,000 to Huls in the plan of reorganization: "in the absence of extensive litigation of this claim in the confirmation proceeding, CoreStates would not now be prevented from bringing its suit." Id. at 206. In other words, CoreStates actually litigated the same cause of action -- Huls' entitlement to the $600,000 as opposed to CoreStates' -- in the plan confirmation process that it sought to litigate thereafter.

Huls illustrates, in what we recognized to be a somewhat unique factual and procedural setting, that one does not get a second bite at the proverbial apple simply because the first bite was taken in a bankruptcy case. See Huls, 176 F.3d at 202 (citations omitted). Similarly, we note that care must be taken in determining whether the first bite was actually taken such that it would preclude the second. Huls does not stand for the proposition that nondebtors must assert all potential claims in a bankruptcy case or be forever barred, nor does Mahan ask us to reach such a conclusion. Rather, Huls helps us frame the key question that the parties agree we should ask whenever the affirmative defense of claim preclusion is raised on the basis of a prior bankruptcy confirmation order, namely, whether the later claim arises from the same cause of action as a claim that was actually asserted or interposed in the earlier bankruptcy case and resolved in the confirmation order. Here, we have concluded that it does not. 16

For the foregoing reasons, we conclude that Eastern's suit against Mahan is not barred and we will, therefore, reverse the District Court's grant of summary judgment and remand for further proceedings.

_____

16. Recent decisions of other courts bolster our interpretation as to how claim preclusion is reasonably applied in the context of bankruptcy. For example, the Court of Appeals for the Fifth Circuit recently concluded that a hearing determining the fees earned by an accounting firm for services rendered to the bankruptcy estate barred the bankruptcy trustee from later suing the accounting firm for negligence and professional malpractice because both disputes squarely presented the identical question of the quality and value of thefirm's services to the bankruptcy estate. See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.), 200 F.3d 382, 387 (5th Cir. 2000).

16

Denial of Eastern's Motion to Amend

Eastern also appeals the District Court's denial of Eastern's motion requesting leave to amend its complaint a second time to add RICO claims against Mahan and to join two additional defendants.17 Eastern contends that the District Court erroneously relied on Rule 16(b) of the Federal Rules of Civil Procedure without sufficient consideration of Rules 15(a) and 42. We review the District Court's determination for abuse of discretion. See Epstein, 10 F.3d at 174.

The District Court's case management conference order set the amendment and joinder deadlines for June 30, 1998. App. 121a–122a. On January 6, 1999, more than six months after the deadline, Eastern filed its motion for leave to amend. App. 124a. As justification for seeking leave to amend, Eastern stated that it had become aware of the viability of new claims and that filing an amended complaint would conserve judicial resources and would obviate the need for a separate action. App. 125a. Opposing Eastern's motion, Mahan argued that Eastern had to comply with Rule 16(b) of the Federal Rules of Civil Procedure before seeking amendment under Rule 15(a); 18 because Eastern had not been diligent, Mahan contended, the amendment should not be allowed under Rule 16(b). Slip Op. at 5.

Agreeing with Mahan's reasoning, the District Court concluded that good cause had not been shown under Rule 16(b) to modify the case management order. According to the District Court, Eastern had not specified what led it to decide that RICO claims could be pled or why information

_____

17. The District Court denied this motion on March 1, 1999, prior to granting summary judgment.

18. Rule 15(a), "Amended and Supplemental Pleadings," provides that under most circumstances, a party seeking to amend more than once may do so only by leave of court or with the adverse party's written consent, although "leave shall be freely given when justice so requires." FED. R. CIV. P. 15(a). Rule 16(b) instructs courts to set time limits in connection with pretrial conferences, and a "schedule shall not be modified except upon a showing of good cause and by leave of the district judge." FED. R. CIV. P. 16(b).

17

from independent sources could not have been obtained earlier. Slip Op at 6. The District Court concluded that it need not examine Eastern's Rule 15(a) argument, but nonetheless noted that there was sufficient reason to deny Eastern's motion under Rule 15(a) due to Eastern's unexplained delay in moving to amend.

We conclude that the District Court acted well within its discretion when it denied Eastern's motion to amend the complaint six months after the amendment and joinder deadlines had expired, and we will not disturb the Court's ruling in this regard.[19]

For the foregoing reasons, we will REVERSE the District Court's entry of summary judgment. We will AFFIRM the District Court's denial of Eastern's untimely motion to amend its complaint.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

19. Eastern has withdrawn the third issue it originally listed for appeal, namely the District Court's denial of Eastern's request to file an outsized
brief. See Reply Brief of Appellants, at 8.

18